**Tommy McNEAL, Petitioner,**

v.

**John Allen COLLIER, Superintendent, Mississippi State Penitentiary, Respondent.**

**No. DC 7234-S.**

United States District Court, N. D. Mississippi, Delta Division.

Dec. 6, 1972.

David M. Lipman, North Mississippi Rural Legal Services, Oxford, Miss., Johnnie E. Walls, Jr., North Mississippi Rural Legal Services, Greenwood, Miss., for petitioner.

Edwin A. Snyder, Asst. Atty. Gen., State of Mississippi, Jackson, Miss., for respondent.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

Tommy McNeal, a young black male, was brought to trial on a murder charge during the July, 1968 term of the Circuit Court of Coahoma County, Mississippi. However, because of an unexpected development, the trial was aborted during the presentation of the state's case, and the jury dismissed over the objection of defense counsel. Six months later, in the January, 1969 term, McNeal was again brought to trial on the same charge. On this occasion the trial was completed, and McNeal was convicted. The Mississippi Supreme Court, without considering the issue raised here, affirmed the conviction, and McNeal is now serving a life sentence. McNeal v. State of Mississippi, 231 So.2d 491 (Miss.1970). Contending that the state twice subjected him to jeopardy for the same offense, McNeal has petitioned this court for habeas corpus relief. 28 U.S. C.A. §§ 2241, 2254.

Having determined that the petitioner exhausted available state remedies, this court conducted an evidentiary hearing on October 10, 1972. Petitioner, an indigent, proceeded *in forma pauperis*, and was ably represented by legal aid counsel. The court has considered memoranda submitted by the parties, state court transcripts, and a partial transcript of the evidentiary hearing. The action is ready for decision.

■ Each case in which a double jeopardy claim is raised must, to repeat the legal cliche, turn upon its own facts. Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). The facts of this case will be considered in detail before the law is applied.

During an attempted robbery on March 9, 1968, a service station attendant was murdered in Clarksdale, Mississippi. Tommy McNeal, Louis Banks and one other were indicted for the offense. A severance was granted as to each of the defendants, and McNeal's case was the first called for trial. Of the other defendants, one was never tried and Banks was acquitted in circumstances described below.

Although the state intended to call fifteen witnesses, only two were able to substantially link petitioner with the murder: Louis Banks, co-indictee, and David Luster, a fifteen year old boy who had no personal connection with the incident, but who claimed to have overheard McNeal admit shooting the attendant. Luster had apparently provided a vacillating or conflicting story; however, the district attorney interviewed him on more than one occasion, and by the day of trial was satisfied that Luster's testimony would be admissible, and would tend to establish the petitioner's guilt.

Banks, under indictment for the same offense, was obviously a witness for whom the Fifth Amendment privilege would have been readily available. Law enforcement officials, however, had earlier concluded that Banks played only a minor role in the tragedy, and, after consultation with his attorney, agreed that a *nolle prosequi* would be entered in return for Banks' testimony in the trial of McNeal. In fact, it is clear that Banks was indicted only to insure his availability as a witness. Banks, incidentally, was the only one of the three released on bond.

Although the district attorney was an experienced prosecutor, he had never attempted to place a co-indictee on the stand. His only insurance was an oral agreement to testify. Nevertheless, he was satisfied with this assurance.

From the state's vantage point, the case was apparently proceeding smoothly until David Luster, the fourteenth witness, was called to the stand. An excerpt of his testimony follows:

Q. All right, on the day after (the attendant) was killed, on Sunday, did you see the defendant Tommy McNeil (McNeal)?

A. I saw him that Sunday, in the afternoon.

Q. Afternoon. Where and in whose company?

A. I saw him, Louis Banks, James Patterson, Roosevelt Ford and Tommy McNeil, uncle.

Q. There are two Tommy McNeils?

A. Yes, sir. . . .

Q. I am referring now to the defendant, Tommy McNeil . . . what conversation did you have with him . . . just tell it in detail?

A. I didn't have no conversation with him.

Q. You didn't have any conversation with him?

A. No, sir.

Q. Who did you have a conversation with?

A. I had a conversation with his uncle.

Q. Was it in his (the defendant's) presence?

A. . . . he come in the room and left out . . . me and his uncle had just finished talking.

After a brief flurry, the jury was directed to retire. Claiming surprise, the district attorney reminded Luster of his testimony before the grand jury, and his previous statement. Luster was examined in detail: in fact, he was harangued, exhorted and cajoled. However, maintaining that his prior statements were the result of unspecified intimidation, Luster repeatedly testified that Tommy McNeal, the uncle, had told him that Tommy McNeal, the accused, shot the station attendant. At the evidentiary hearing, the district attorney stated that he was unable to locate the uncle in order to present him as a witness.

The jury returned, and testimony resumed. Luster, however, refused to recant. After the jury retired again, the district attorney dismissed Luster, and executed an affidavit for a perjury charge. The pending testimony of Banks, earlier anticipated as the key to the trial, now assumed even greater significance.

Banks' attorney had previously assured both the sheriff and the district attorney that Banks would waive his right to invoke the privilege against self-incrimination. This assurance was made despite a pending indictment because, as the attorney later testified, after a review of the case he was convinced that the state's evidence was not sufficient to convict, and he thought he could arrange with the prosecuting officials for a light charge or favorable treatment for his client. On the morning of trial, the district attorney held a conference with Banks, and reviewed his testimony. On the same day, his attorney again indicated that Banks would testify.

When Banks, the final witness, was called to the stand, McNeal's attorney asked for a recess to talk with Banks and confer with his counsel, who was present in the courtroom. The request was honored, and after a conference both attorneys returned to the courtroom to announce that Banks would not be permitted to testify. Aware that the privilege may only be invoked by those who claim its protection, the trial judge called Banks as a witness and interrogated him. On the advice of counsel, Banks refused to testify.

During the evidentiary hearing, Banks' attorney summarized the event which prompted his abrupt decision:

Q. Now, at what point did you change your mind not to let Banks testify?

A. When I was in the anteroom with my client and (McNeal's attorney) . . . I decided then . . . I told (McNeal's attorney) that I had changed my mind and I was not going to permit him to testify, because I thought it was to his best interest not to testify. I am referring there to Banks.

Q. Was this decision prompted by anything that was said by anyone?

A. No, sir. I realized there when (McNeal's attorney) and I were talking over the matter that I had not re-

ceived a definite commitment, that I might be making a terrible mistake. . . . It was my sole decision, because my client was a young black boy. . . .

McNeal's attorney also recalled the episode:

A. I had several conversations with (Banks' attorney) during the day . . . I don't remember how many. . . . During the course of my defense of Mr. McNeal, I of course, as I remember, was trying to prevail upon (Banks' attorney) not to let him testify. . . . And I believe I did have one final conversation . . . with the court's permission . . . immediately prior to his being called to testify.

Q. What occurred in that conversation. . . ?

A. . . . I am certain that I must have tried to prevail upon (him) not to allow (Banks) to testify. I am sure that I, myself, tried to convince (him) that it would be to his client Banks' interest that he not testify. And my recollection is . . . that (he) must have agreed because he didn't allow him to testify.

■ The district attorney immediately requested a *nolle prosequi*; the request was granted, and the jury discharged over the defendant's objection. The *nolle prosequi*, of course, was tantamount to a mistrial granted on behalf of the state.

Within a few days and at the same term of court, Banks was placed on trial for murder. The district attorney intentionally failed to put on substantial proof. Upon motion, Banks was awarded a directed verdict of acquittal. After the acquittal of Banks, the court called the Grand Jury back into session. Using Banks as a witness, the district attorney obtained a new indictment against McNeal.

At the next term of court, McNeal, now represented by the attorney who earlier represented Banks, was again tried on the same charge but under the new indictment. Banks testified at the second trial, and the jury returned a guilty verdict. The petitioner's attorney failed to raise the issue of double jeopardy at trial or upon appeal; frankly, this potential defense did not occur to him.

■ McNeal was not informed by his attorney or anyone else, that he could not be twice placed in jeopardy for the same offense, and that such was prohibited by the double jeopardy clause of the Fifth Amendment to the Constitution of the United States. Under the circumstances, it is clear that the petitioner did not waive his right to subsequently raise a claim of former jeopardy. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Winters v. Cook, 466 F.2d 1393 (5th Cir. 1972).

■■ On appropriate occasions, the Fifth Amendment serves as a shield to protect the accused from multiple or successive prosecutions for the same offense, whether initiated on behalf of the United States or any respective state. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), overruling Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Where required, protection is to be applied retroactively. Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970); Galloway v. Beto, 421 F.2d 284 (5th Cir. 1970); Booker v. Phillips, 418 F.2d 424 (10th Cir. 1969).

■■ Moreover, a petitioner, incarcerated as the result of a state court judgment, may raise a plea of former jeopardy in a federal habeas corpus forum. Galloway v. Beto, *supra*; United States ex rel. Hetenyi v. Wilkins, 348 F.2d 844 (2nd Cir. 1965); *But cf.* Barker v. State of Ohio, 328 F.2d 582 (6th Cir. 1964). Otherwise, there would exist only minimal opportunity to afford the retroactive protection *Benton* demands. A claim of former jeopardy, furthermore, must be tested by the application of federal standards. United States ex rel. Somerville v. Illinois, 447

F.2d 733 (7th Cir. 1971); Booker v. Phillips, *supra*.

■ The Fifth Amendment protection is, of course, qualified because not all subsequent prosecutions are automatically barred. For example, an accused may be constitutionally retried where the first jury is unable to arrive at a verdict, United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); where the judge discovers that one or more members of the jury may harbor an important bias, and dismisses the panel, Thompson v. United States, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894); where a prior conviction is vacated upon appeal, Ball v. United States, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); or where the conviction is set aside in a collateral proceeding. United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964). However, apart from a narrow category of cases in which a subsequent prosecution is clearly permissible, the Supreme Court, recognizing the elusive nature of the problem, has steadfastly declined to formulate hard and precise rules. Instead, each case is to be resolved on an individual basis. An ultimate determination must rest, therefore, upon a review and evaluation of the circumstances. United States v. Perez, *supra*; Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); Downum v. United States, *supra*; United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

■ Nonetheless, the accused or the petitioner is not left to judicial vagary, nor is the reviewing tribunal a vessel adrift. A lighthouse, however distant or dim, has been erected and manned. Mr. Justice Story articulated the familiar standard:

> We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, courts should be extremely careful how they interfere with any chances of life in favor of the prisoner. United States v. Perez, *supra* 22 U.S. at 579.

The rule, then, is one of reason and sensibility; discretion is vested in the trial judge. Reduced to essentials, it is a matter of balancing a defendant's right to be free of successive prosecutions against the interest of society in punishing those who commit crimes. The balance, however, is not delicate: the scales are automatically tipped in favor of the accused. Downum v. United States, *supra.* Nevertheless, the state's handicap is not insuperable. All courts recognize that ". . . a criminal trial is, even in the best of circumstances, a complicated affair to manage." United States v. Jorn, *supra*, 400 U.S. at 479, 91 S.Ct. at 554.

To meet or surmount the burden, the state must show a "manifest necessity", and "urgent circumstances" which dictate a mistrial. In a capital case, special consideration must be given to the rights of the accused. Any doubt as to the necessity of a mistrial, moreover, must be resolved in favor of the liberty of the accused. Downum v. United States, *supra.*

The mandate is easy enough to verbalize. Considerable difficulty may arise, however, when it is applied in specific cases. *E. g.,* United States v. Walden, 448 F.2d 925 (4th Cir. 1971); United States v. Smith, 390 F.2d 420 (4th Cir. 1968); Featherston v. Mitchell, 418 F.2d 582 (5th Cir. 1969), cert. denied 397

U.S. 937, 90 S.Ct. 945, 25 L.Ed.2d 117; Howard v. United States, 372 F.2d 294 (9th Cir. 1967), cert. denied 388 U.S. 915, 87 S.Ct. 2129, 18 L.Ed.2d 1356; Loux v. United States, 389 F.2d 911 (9th Cir. 1968), cert. denied 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135; Oelke v. United States, 389 F.2d 668 (9th Cir. 1967), cert. denied Graves v. United States, 390 U.S. 1029, 88 S.Ct. 1420, 20 L.Ed.2d 286.

Claims of former jeopardy may arise in a variety of contexts. Here, of course, we are concerned with the limited range of cases in which the trial judge terminates the proceedings after the jurors are impaneled but before they are called upon to decide the issue, and without the accused requesting a mistrial. E. g. Houp v. Nebraska, 427 F.2d 254 (8th Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 887, 27 L.Ed.2d 827. Inquiry is limited to a single *post hoc* determination: did the trial judge abuse his limited discretion by allowing, under the circumstances, a *nolle prosequi* which was tantamount to a mistrial?

To support his contention, the petitioner relies upon *Downum*. However, after a careful consideration of the circumstances, this court is convinced that *Downum*, while controlling, does not dictate the result which petitioner seeks. There, the jury was discharged after the prosecution discovered that an important witness was absent. The defendant was in no way responsible for the absence, and the government could have proceeded with proof on several other counts of the indictment. The conviction by a second jury was reversed; but the court "refuse[d] to say that the absence of witnesses 'can never justify discontinuance of a trial.'" Downum v. United States, *supra* 372 U.S. at 737, 83 S.Ct. at 1035.

In the case *sub judice* the witness who invoked the privilege against self-incrimination was, in effect, absent and unavailable to testify. Unlike *Downum*, however, the indictment charged only one count, and, especially in view of the unexpected dismissal of Luster, the testimony of Louis Banks was absolutely essential. While the prosecutor could have taken more effective steps to cement his position, the court is convinced that the effective absence of the witness, under these particular circumstances, created a "manifest necessity" for a mistrial. It must be noted that the invocation of the privilege against self-incrimination was largely the result of the course pursued by petitioner's trial counsel; a course which was a solicitation for the mistrial. The district attorney had been led to believe that Banks would testify. It was not until Banks was called as a witness that the decision was made by him and his attorney to invoke the Fifth Amendment privilege. Petitioner's trial attorney was instrumental in bringing this about. The court said in *Downum, supra*, at 736, 83 S.Ct. at 1034, "at times the valued right of a defendant to have his trial completed by that particular tribunal summoned to sit in judgment on him may be subordinated to the public interest when there is an imperious necessity to do so."

If the state's evidence on the second trial is to be believed, as it evidently was by the jury, it reveals a deliberate crime in the commission of which, the victim's life was feloniously taken. The district attorney had the duty to protect the public, and to endeavor to see that justice prevailed. The public interest would not have been served by continuing the trial under the circumstances. Petitioner's right to have the trial completed at first hearing must be, in this instance, subordinated to the public interest.

There remains, however, a question as to the full impact of United States v. Jorn, *supra*, on this case. *Jorn* is apparently a significant addition to the "manifest necessity" doctrine. Undercutting the "party benefitted" test, *Jorn* holds that a trial judge must not foreclose the defendant's option to have his trial completed by a particular tribunal until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings. At least one court has afforded

**492**

retroactive application to *Jorn*. United States v. Walden, *supra*. While the trial judge in the state court acted immediately on the prosecutor's request for a *nolle prosequi*, without requiring him to explore alternative avenues, the record reflects that the trial judge was fully advised and informed of all matters necessitating the *nolle prosequi*.

*Jorn* deals directly with ·*sua sponte* declarations by which the trial judge alone acts to foreclose the defendant's option. In the ·case *sub judice*, the action of petitioner's trial attorney effec-·tively foreclosed the petitioner's valued right to proceed to a conclusion before the first jury. The court, therefore, holds that *Jorn* does not require that the petitioner be discharged from custody.

Throughout this action, there has been absolutely no proof, nor even an intimation, of prosecutorial or judicial overreaching. Clearly, the second trial was not initiated to harass the petitioner. It was dictated by an imperious and compelling necessity.

An appropriate order will be entered finally dismissing the petition for a writ of habeas corpus.