**Tommy McNEAL, Petitioner-Appellant,**

v.

**William HOLLOWELL, Superintendent, Mississippi State Penitentiary, Respondent-Appellee.**

No. 73-1214.

United States Court of Appeals, Fifth Circuit.

July 13, 1973.

Rehearing and Rehearing En Banc Denied Nov. 23, 1973.

David M. Lipman, Oxford, Miss., Johnnie E. Walls, Jr., Greenwood, Miss., for petitioner-appellant.

A. F. Summer, Atty. Gen., Edwin A. Snyder, Asst. Atty. Gen., Jackson, Miss., for respondent-appellee.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and DYER, Circuit Judges.

DYER, Circuit Judge:

This habeas corpus petition presents the single important question of whether McNeal's trial and conviction in a Mississippi state court was barred by an earlier jury trial on the same charge which was terminated, prior to a verdict and over McNeal's objection, by the prosecutor's successful request for a *nolle prosequi*. We conclude that the second trial violated the Fifth and Fourteenth Amendments' proscription against placing a person in jeopardy twice for the same offense. Accordingly we reverse.

When considering cases raising similar double jeopardy issues, the Supreme Court has consistently stated that it would be inappropriate to create a body of rigid and mechanical rules by which to judge the merits of the constitutional claim; instead the problem must be evaluated in terms of all the facts and circumstances of each individual case. Illinois v. Somerville, 1973, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425; United States v. Perez, 1824, 22 U.S. 579, 9 Wheat. 579, 6 L.Ed. 165. Consequently, we set out in detail the circumstances that gave rise to McNeal's petition.

I.

In March 1968, the manager of a Clarksdale, Mississippi, gas station was killed in a robbery attempt. Several days later, Louis Banks was apprehended as a suspect and he gave a complete account of what transpired at the gas station. Because of his cooperation and because he was believed to be a "lesser actor" in the murder, he was allowed to make a reduced bond, but, on July 11, 1968, he was indicted, along with McNeal and Roosevelt Ford, for the murder of the station attendant. The trials of the three defendants were severed and McNeal was tried first, initially on July 25, 1968.

In preparing for McNeal's trial, the prosecutor realized that he had two key witnesses. The first, David Luster, was not totally cooperative or consistent, but he had stated on several occasions that McNeal told him that he was the one who had shot the station attendant. The second key witness was Banks, whose retained counsel was Joseph Kellum. In his discussions with the prosecutor prior to and even early in the trial, Kellum indicated that his client would not invoke his Fifth Amendment privilege against self-incrimination.[1]

McNeal was brought to trial on July 25, 1968, and a jury was impaneled and sworn. On the second day of trial, after thirteen witnesses had testified for the State, the prosecutor called Luster to the stand, planning to call Banks next as the State's last witness.

Luster's testimony on the stand was not what the prosecutor either wanted or expected. Instead of testifying that he heard Tommy McNeal, the *defendant*, say that he had killed the station attendant, Luster stated that Tommy McNeal, the defendant's *uncle* had told him that Tommy McNeal, the defendant, had said that he had killed the attendant. Following this surprise, the prosecutor made an extensive attempt to get Luster to recant this testimony, but Luster refused to change his story. With Tommy McNeal, the uncle, unavailable as a witness, the status of Banks as an already crucial witness was heightened.

Banks was then called to the stand as a witness. At this time McNeal's counsel, Harvey Ross, apparently obtained permission from the court to speak to Banks and his attorney, Kellum, in an

1. According to Kellum's testimony at the federal habeas hearing, he took this position because he felt the State had a weak case against his client and because he hoped to get a deal of some sort from the State. He stated, however, that prior to the trial he had not obtained a definite agreement of any kind from the prosecution. The State prosecutor testified at this same hearing that "it was understood" by Kellum that Banks would take the stand as a prosecution witness; in return, Banks would not be prosecuted.

anteroom off of the courtroom.[2] Following a vociferous, but unreported exchange Kellum returned to the courtroom and announced that he would not allow his client, Banks, to testify. Banks was then sworn and he stated that he would not testify, claiming his Fifth Amendment privilege.

With both of his key witnesses unable or unwilling to substantiate the State's case, the prosecutor immediately requested that the case against McNeal be "nolle prosequied." McNeal's counsel objected, requesting a conclusion of the trial on the merits or, if the State had no further proof, a directed verdict of acquittal. The court thereupon granted the prosecutor's motion and discharged the jury, stating that the prosecutor "has found out after getting into it that he is unable to make out his case."[3]

A few days after the *nolle prosequi* in the McNeal case, Banks was placed on trial for murder. According to the same prosecutor's later testimony, he intentionally offered little evidence in this case because he knew that the court would direct a verdict of not guilty, which would have the effect of granting Banks immunity.[4] McNeal was quickly re-indicted and came to trial again in February 1969 at the next term of court. This trial culminated in his conviction, which was affirmed on appeal. McNeal subsequently exhausted his

2. The transcript of McNeal's first trial has only been partially transcribed for our use. The portion of the proceedings that includes the testimony of Luster and the appearance of Banks has been reproduced, however, and this does not show any reference to Ross' request for a conference with Banks and Kellum at that time. It is clear nevertheless that Ross had spoken with Kellum several times during the trial about whether Banks would testify. Consequently, the district court's conclusion, based on the testimony at *its* hearing, that there was a conference just after Banks was called is not clearly erroneous.

3. The following is a complete transcript of the exchange between the court, the prosecutor, and Ross, immediately following the dismissal of the witness Banks.

COURT: Call your next witness, please.

MR. STONE [prosecutor]: Your Honor, we ask that this case against the defendant be nolle prosequied, Your Honor.

COURT: Call your next witness.

MR. STONE: Your Honor, we move that this case be nolle prosequied.

MR. HARVEY T. ROSS: If the Court please, we object to that motion.

COURT: You object to the nolle prosequi?

MR. ROSS: This defendant is entitled to have this case disposed of on its merits at this point. If the State has no further proof, this defendant is entitled to a directed verdict of not guilty.

COURT: I think the State can ask for a nolle prosequi at any time. I think that the District Attorney can ask for a nolle prosequi at any time— I have never seen an objection before to a nolle prosequi.

MR. ROSS: If the Court please, this is a charge of murder. The District Attorney has had six months to prepare this case.

COURT: I am going to grant the motion for nolle prosequi. Let the jury come in.

COURT: (To jury) Ladies and gentlemen of the jury, the District Attorney has very commendably asked for a nolle prosequi in this case; he has found out after getting into it that he is unable to make out his case, and he has asked that the case be nolle prosequied against this defendant, and the Court is following the recommendation of the District Attorney, and he is entering a nolle prosequi.

\* \* \* \* \*

JURY DISMISSED—COURT ADJOURNED

4. The prosecutor's attitude toward Banks' trial parallels his unorthodox attitude with respect to the original indictment against Banks. At the federal habeas hearing he stated that the Banks indictment was sought not with the intent to pursue a conviction, but essentially "to ensure his presence" at McNeal's trial. When that mute presence at McNeal's first trial was insufficient to yield a conviction, the prosecutor extended the charade by first staging a sham trial against Banks and by then using the "immunized" Banks before the same grand jury to obtain a second indictment of McNeal and before a different jury to obtain the conviction now questioned.

State post-conviction remedies and filed his federal habeas corpus petition. Following a full evidentiary hearing, the district court concluded that any necessity for a *nolle prosequi* in the first trial was precipitated by McNeal's counsel's last-minute conference with Banks and his attorney. Consequently, the habeas petition was denied. McNeal v. Collier, D.C., 353 F.Supp. 485.

## II.

McNeal's argument in condensed form is that there was no improper conduct by his counsel at the first trial and that the state trial judge abused its discretion by granting a *nolle prosequi* long after the jury had been impaneled and substantial evidence had been offered. The State responds that no judicial or prosecutorial misconduct has been shown to have occurred and that the district court's finding that a manifest necessity for the *nolle prosequi* existed because Banks' Fifth Amendment claim was solicited by McNeal's counsel is not clearly erroneous. We thus face the seemingly uncomplicated task of applying the law on double jeopardy to the facts before us.

## III.

The law regarding double jeopardy has recently been carefully reviewed and explained by the Supreme Court in Illinois v. Somerville, 1973, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425, and by this Court in Smith v. Mississippi, 5 Cir. 1973, 478 F.2d 88. Therefore, with reference to these two cases we refrain from treating *in extenso* all of the principles and policies inherent in the theory of double jeopardy and instead direct our attention to the particular factors which have a bearing on the resolution of the issue before us.

■ The Fifth Amendment's proscription against placing a person in jeopardy twice for the same offense has been applied to the states through the Due Process Clause of the Fourteenth Amendment and this application must be made retroactively. Benton v. Maryland, 1969, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707; *see* Price v. Georgia,

1970, 398 U.S. 323, 331 n. 9, 90 S.Ct. 1757, 26 L.Ed.2d 300; Ashe v. Swenson, 1970, 397 U.S. 436, 437 n. 1, 90 S.Ct. 1189, 25 L.Ed.2d 469; Waller v. Florida, 1970, 397 U.S. 387, 391 n. 2, 90 S.Ct. 1184, 25 L.Ed.2d 435; North Carolina v. Pearce, 1969, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656; Galloway v. Beto, 5 Cir. 1970, 421 F.2d 284, cert. denied, 400 U.S. 912, 91 S.Ct. 137, 27 L.Ed.2d 151.

■ Because "[t]he prohibition is not against being twice punished, but against being twice put in jeopardy," United States v. Ball, 1896, 163 U.S. 662, 669, 16 S.Ct. 1192, 1194, 41 L.Ed. 300, it is necessary to determine when jeopardy attaches in a jury trial. In Downum v. United States, 1963, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100, the Supreme Court recognized that this occurs when the jury is impaneled and sworn, thus vesting the defendant with the valued right to have his trial completed before that tribunal and that jury. *See* Wade v. Hunter, 1949, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974.

■ This "valued right" is not absolute, however, and the determination that jeopardy has attached is the first step on the road to a decision on the double jeopardy question, and not the last. When, as in this case, jeopardy has attached, and only then, the inquiry shifts to the trial judge who, in his sound discretion, must consider all the circumstances to determine whether there is a manifest necessity to dismiss the jury without a verdict or whether the ends of public justice would otherwise be defeated. United States v. Perez, 1824, 22 U.S. 579, 580, 9 Wheat. 579, 580, 6 L.Ed. 165.

The problem of moving from the general formulation in *Perez* to the facts of an individual case is complicated by the absence of any rigid rules, which makes categorization of earlier cases extremely difficult. *See* Wade, *supra* 336 U.S. at 691, 69 S.Ct. 834. The Supreme Court in *Somerville*, while continuing to reject a rigid classification, did distill a general approach from the previously decided cases and recognized at least two lines of precedent.

The first generalization is that a trial judge correctly declares a mistrial [5] when, in his discretion, "an impartial verdict cannot be reached, or . . . a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." *Somerville, supra* 93 S.Ct. at 1070, 35 L.Ed.2d at 431.[6] The fatally defective indictment in *Somerville* fell into this class, as would the potentially prejudiced juror in *Smith.*[7]

Our case simply does not even remotely resemble the cases relied on in *Somerville,* or those which have since followed it. The first state trial below contained no hint of prejudice that would have impeded the attainment of an impartial jury verdict; similarly no procedural error has been called to our attention that would warrant the jury's dismissal so as to implement a reasonable state policy and serve the ends of public justice.

The second line of precedent recognized in *Somerville,* however, is potentially more useful to us. The Supreme Court there noted that the declaration of a mistrial based on "a rule or a defective procedure that [lends] itself to prosecutorial manipulation" would be an entirely different case. 93 S.Ct. at 1070, 35 L.Ed.2d at 431. Presumably such a case would require the invocation of the Fifth Amendment's bar to reprosecution.

On its face, the granting of the motion for a *nolle prosequi* below fits squarely within this principle. The primary example given for this general approach was *Downum, supra,* which the *Somerville* Court considered to be a case "where the mistrial entailed not only a delay for the defendant, but also operated as a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case." 93 S.Ct. at 1073, 35 L.Ed. at 434. In McNeal's case, the *nolle prosequi* resulted in a delay in trial of over six months and was ostensibly granted by the trial judge because the prosecutor "has found out after getting into it that he is unable to make out his case." *See* footnote 3, *supra.* Since a *nolle prosequi* in Mississippi does not, and obviously did not, preclude reindictment and retrial, the practice followed in the state trial court would seem to create a situation with a tantalizing potential for prosecutorial misconduct.

The State responds to this argument by contending that the language used by the trial judge in discharging the jury is not dispositive of the reasons behind the discharge, that there was a manifest necessity for the *nolle prosequi,* and that the necessity arose out of the conduct of McNeal's counsel. Its argument is based on the general rule that a defendant who successfully moves for a mistrial, knowing that his actions will result in a trial to another jury, cannot invoke the bar of double jeopardy at the second trial. United States v. Beasley, 5 Cir. 1973, 479 F.2d 1124; United States v. Iacovetti, 5 Cir. 1972, 466 F.2d 1147, 1152, cert. denied, 1973, 410 U.S. 908, 93

---

5. It has not been suggested, nor do we think it could be, that the *nolle prosequi* in this case differed in any material respect from a mistrial, which is, the most common source of double jeopardy claims.

6. *See* Lovato v. New Mexico, 1916, 242 U.S. 199, 37 S.Ct. 107, 61 L.Ed. 244 (reprosecution not barred when jury discharged after prosecution realized that defendant had not been re-arraigned after his demurrer to the indictment was overruled) ; Thompson v. United States, 1894, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (reprosecution not barred when mistrial declared following discovery that one

member of jury was disqualified as having been a member of the grand jury that indicted the defendant).

7. In *Somerville,* the indictment under which the defendant was being tried did not allege the necessary elements of a crime, and this defect, which could not be remedied, could have been asserted on appeal or in a post-conviction proceeding to overturn a final judgment of conviction. In *Smith,* after a careful investigation of the circumstances surrounding a remark made by one of the jurors, the trial judge concluded that that juror had prematurely formed an opinion about an important element of the case.

S.Ct. 963, 35 L.Ed.2d 270. From this rule flows the State's main premise, that a defendant who actively engages in a course of conduct calculated to necessitate the granting of a mistrial, but who does not actually request a mistrial, is similarly barred from relying on a double jeopardy defense at a second trial. *See* United States v. Pridgeon, 5 Cir. 1972, 462 F.2d 1094; United States v. Walden, 4 Cir. 1971, 448 F.2d 925, 929; Loux v. United States, 9 Cir. 1968, 389 F.2d 911, 921, cert. denied, 393 U.S. 867, 869, 89 S.Ct. 151, 21 L.Ed.2d 135. *See also* United States v. Jorn, 1971, 400 U.S. 470, 487–488, 91 S.Ct. 547, 27 L.Ed.2d 543 (Burger, C. J., concurring).

We take no issue with either rule advanced by the State but, upon our reading of the record, we conclude that neither is applicable to the case before us. It is plain from the record that the situation which led the prosecutor to move for a *nolle prosequi* was caused by the confluence of three factors.

The first factor was Luster's testimony, which, due to its hearsay nature, could not be used by the prosecutor to support the case against McNeal. There has been no hint of a causative link, however, between McNeal and his counsel on the one hand and Luster's vacillation on the other. The prosecutor simply took a chance on a questionable witness and lost. As such, this factor is of absolutely no assistance to the State in its attempt to establish a manifest or imperious necessity for the *nolle prosequi*.

The second factor was the prosecutor's reliance on the testimony of co-indictee Banks to link McNeal to the murder. Without reference to the tactics used to make Banks available to testify, *see* footnote 4, *supra*, it is clear that the prosecutor took another chance by placing Banks on the stand while he was still under an indictment for the same offense. Mississippi apparently has no general immunity statute, but, in retrospect, certain steps could have been taken that would have increased the likelihood of Banks' testifying.[8] Instead, the prosecutor chose to rely on an informal "understanding," which he felt he had with Kellum, Banks' counsel. Although this may not have been completely unreasonable under the circumstances, the continuing real possibility that Banks would invoke the Fifth Amendment's protection cannot, without more, be "blamed" on McNeal so as to create the manifest necessity that would allow a *nolle prosequi* to insure that the ends of public justice were not defeated.

The final factor that influenced the situation was the actual invocation of the Fifth Amendment by Banks. The district court concluded that "the invocation of the privilege against self-incrimination was largely the result of the course pursued by petitioner's trial counsel; a course which was a solicitation for the mistrial." We accept the finding of fact of the district court— that Banks' use of the Fifth Amendment was largely the result of the actions by McNeal's counsel—because, on the record before us, it is not clearly erroneous. Fed.R.Civ.P. 52(a); *see, e. g.* Corpus v. Beto, 5 Cir. 1972, 469 F.2d 953. Nevertheless, the district court's legal conclusion—that this action is tantamount to a solicitation of a mistrial— is untenable.

The State would have us liken our case to ones which concerned an unavailable witness. It acknowledges that if the witness is unavailable through sloppy prosecutorial preparation, then there is no manifest necessity for a mistrial. *See, e. g. Downum, supra*; Cornero v.

---

8. Without condoning the tactic of obtaining the initial indictment against Banks, once that had been accomplished, the "immunizing" trial of Banks could easily have preceded the McNeal trial. Alternatively, the prosecutor could have sought a *nolle prosequi* or a "remand to the files" on the Banks indictment prior to McNeal's trial. Neither of these last steps would have totally barred a subsequent prosecution of Banks, but either would have been a more concrete demonstration of the State's lenient attitude toward him.

United States, 9 Cir. 1931, 48 F.2d 69. Conversely, because both litigants in a criminal trial are held to high levels of professional standards, *see Jorn, supra* at 486, 91 S.Ct. 547, the State argues that if it is the defendant who makes a witness unavailable, then any resultant mistrial should not be a bar to reprosecution. *Cf.* ABA Code of Professional Responsibility DR 7–109(B). The State then takes a final leap of faith by concluding that discussing the privilege against self-incrimination with a witness and his attorney and convincing this attorney to have his client plead the Fifth Amendment, makes the witness just as unavailable as if the defense counsel had secreted the witness outside of the jurisdiction of the court. We disagree.

We start from the premise that an individual may not bribe, coerce, force, or threaten a witness to claim the privilege against self-incrimination. *See* 18 U.S. C.A. § 1503; Cole v. United States, 9 Cir. 1964, 329 F.2d 437, cert. denied, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497. *See also* United States v. Herron, N.D. Cal.1928, 28 F.2d 122. None of these forms of conduct has been even tangentially attributed to Ross, McNeal's counsel. Instead, in the course of preparing for the trial of his client, Ross contacted the key witness Banks and his attorney Kellum, apparently impressed on Kellum the danger of Banks' testifying while still under indictment for the same offense, and reminded him of the protection afforded by the Fifth Amendment. This conduct was wholly different than the secretion of a witness suggested by the State and we perceive no impropriety in it.

According to the prosecutor's later testimony, this meeting with Banks at the trial was the first opportunity Ross had had to discuss the case with him. Additionally, it is not suggested that Ross prevailed directly on Banks at this time. Rather it is agreed that at all times Banks' counsel Kellum was exercising his own discretion and that he personally made the final decision to have Banks plead the Fifth Amendment.

On these facts, Ross' conduct was no more than the legitimate action of a defense counsel who was contacting an important witness—a co-indictee—and his counsel to discuss a matter of mutual importance to them. While we need not go so far as to say that it was Ross' duty to do this, we have no doubt that he was entitled to do it and that to do so he need not relinquish any of his client's rights—here the valued right to have his trial concluded before the first jury.

■ We conclude that no manifest necessity and no ends of public justice required the granting of the *nolle prosequi* in McNeal's first trial. The prosecutor's uncomfortable position was caused by nothing more unusual than his reliance on a vacillating witness and on one whose testimony he had not sufficiently insured would be forthcoming. Ross, acting within this authority and professional responsibility, did no more than point out what at that time was a weakness in the presentation of the State's case. We hold that the granting of the *nolle prosequi* in order to allow the State an opportunity to shore up that weakness violated McNeal's Fifth and Fourteenth Amendment rights.

In reaching this decision we are not unmindful of the strong public interest in the efficient administration of justice. This is generally protected by the trial judge who, prior to granting or denying a motion for a mistrial or *nolle prosequi,* should make a painstaking examination of all the facts and circumstances that underlie the request. Only after such a careful investigation can a trial judge properly exercise his discretion as recognized in *Perez. Jorn, supra* 400 U.S. at 487, 91 S.Ct. 547; *Smith, supra.* It is clear from the record that the first state trial judge made no investigation into the reasons behind the prosecutor's request.[9] If he had, McNeal might

---

9. The district court's Memorandum of Decision states, "While the trial judge in the state court acted immediately on the prosecutor's request for a *nolle prosequi,* without requiring him to explore alternative avenues, the record reflects that the

never have been subjected to this constitutionally impermissible second trial.

Reversed.

COLEMAN, Circuit Judge (dissenting):

As he invariably does, my Brother Dyer has written a perfectly constructed opinion, distinguished for its clarity. I agree with its splendid exposition of constitutional principles generally applicable to double jeopardy. The problem is that I do not agree with the majority's application of those principles to McNeal's case.

When James Bogan Weems went to work on March 9, 1968 there was no reason to anticipate that before the day was out he would be a corpse, made so by an armed robber, who escaped to Chicago, where he was later apprehended and extradited. Nevertheless, all persons, including killers, are entitled to certain specified protections vouchsafed by the Constitution of the United States. On post-conviction collateral attack, however, we should be certain that the Constitution requires it before we set free a convicted murderer.

We could readily rely on the able reported opinion of the United States District Judge, who held that McNeal was entitled to no relief, McNeal v. Collier, 353 F.Supp. 485 (N.D., Miss., 1972). I must, however, make some observations of my own.

McNeal's conviction was affirmed on appeal, McNeal v. State, 231 So.2d 491 (Miss.1970). The question of double jeopardy was not raised either in the trial court or on appeal. After the State Supreme Court had affirmed the conviction, petitioner retained new counsel for the purpose of launching a collateral attack. Leave to file a petition for writ of error coram nobis was denied, § 1992.5 Mississippi Code of 1942. The federal habeas corpus proceedings followed.

Almost from the beginning it has been held that the defense of double jeopardy must be raised at the trial, else it is waived, United States v. Wilson, 32 U.S. 150, 8 L.Ed. 640 (1833). This principle has been reiterated in numerous cases. As recently as 1967, the Fifth Circuit reaffirmed it, Grogan v. United States, 5 Cir., 1967, 394 F.2d 287, cert. denied 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 100. See also, Brady v. United States, 8 Cir., 1928, 24 F.2d 399, cert. denied 278 U.S. 603, 49 S.Ct. 10, 73 L.Ed. 531; McGinley v. Hudspeth, 10 Cir., 1941, 120 F.2d 523; Barker v. State of Ohio, 6 Cir., 1964, 328 F.2d 582; Haddad v. United States, 9 Cir., 1965, 349 F.2d 511, cert. denied 382 U.S. 896, 86 S.Ct. 193, 15 L.Ed.2d 153; United States v. Buonomo, 7 Cir., 1971, 441 F.2d 922, cert. denied 404 U.S. 845, 92 S.Ct. 146, 30 L.Ed.2d 81; United States v. Scott, 1972, 150 U.S.App.D.C. 323, 464 F.2d 832; Rule 12(b)(2), Fed.R.Crim.P.

The District Court held that since McNeal was not informed by his attorney or anyone else that he could not for the same offense constitutionally be twice placed in jeopardy he did not waive his right subsequently to raise the claim, citing Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) and Winters v. Cook, 5 Cir., 1972, 466 F.2d 1393 [now on submission en banc]. Hard and fast waiver rules are beginning to meet with exceptions, as witnessed by Davis v. United States, 1973, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 and Tollett v. Henderson, 1973, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235.

The question now is whether McNeal, even in the absence of a waiver, is entitled to habeas corpus relief on the collaterally raised plea of double jeopardy. I would respond in the negative.

I refer to the findings of the District Court, 353 F.Supp. at 488:

"Banks' attorney had previously assured both the sheriff and the district

---

trial judge was fully advised and informed of all matters necessitating the *nolle prosequi.*" Our review of the record convinces us that the trial judge was not so

informed and any finding of fact to the contrary is clearly erroneous. *See* footnote 3, *supra.*

attorney that Banks would waive his right to invoke the privilege against self-incrimination. This assurance was made despite a pending indictment because, as the attorney later testified, after a review of the case he was convinced that the state's evidence was not sufficient to convict, and he thought he could arrange with the prosecuting officials for a light charge or favorable treatment for his client. On the morning of trial, the district attorney held a conference with Banks, and reviewed his testimony. On the same day, his attorney again indicated that Banks would testify.

"When Banks, the final witness, was called to the stand, McNeal's attorney asked for a recess to talk with Banks and confer with his counsel, who was present in the courtroom. The request was honored, and after a conference both attorneys returned to the courtroom to announce that Banks would not be permitted to testify. Aware that the privilege may only be invoked by those who claim its protection, the trial judge called Banks as a witness and interrogated him. On the advice of counsel, Banks refused to testify.

"During the evidentiary hearing, Banks' attorney summarized the event which prompted his abrupt decision:

Q. Now, at what point did you change your mind not to let Banks testify?

A. When I was in the anteroom with my client and (McNeal's attorney) . . . I decided then . . . I told (McNeal's attorney) that I had changed my mind and I was not going to permit him to testify, because I thought it was to his best interest not to testify. I am referring there to Banks.

Q. Was this decision prompted by anything that was said by anyone?

A. No, sir. I realized there when (McNeal's attorney) and I were talking over the matter that I had not received a definite commitment, that I might be making a terrible mistake. . . . It was my sole decision, because my client was a young black boy. . . .

McNeal's attorney also recalled the episode:

A. I had several conversations with (Banks' attorney) during the day . . . I don't remember how many. . . . During the course of my defense of Mr. McNeal, I of course, as I remember, was trying to prevail upon (Banks' attorney) not to let him testify. . . . And I believe I did have one final conversation . . . with the court's permission . . . immediately prior to his being called to testify.

Q. What occurred in that conversation . . . ?

A. . . . I am certain that I must have tried to prevail upon (him) not to allow (Banks) to testify. I am sure that I, myself, tried to convince (him) that it would be to his client Banks' interest that he not testify. And my recollection is . . . that (he) must have agreed because he didn't allow him to testify."

It must be emphasized that this is not a case in which the District Attorney began a trial and thereafter with no supervening event simply decided to *nol pros* in the hope of doing better on another day. Such a course would be indefensible, would clearly amount to jeopardy, and would warrant the most severe condemnation.

The facts here are exactly the opposite. As found by the District Court, McNeal's attorney testified that during his representation of the defendant he had been trying to "prevail" on Banks' attorney not to let him testify. Despite these efforts, that attorney had assured both the sheriff and the district attorney that his client would waive the right to invoke the privilege against self-incrimination. On the very day that Banks was called to the witness stand, these assurances were repeated. The defense had never placed Banks under sub-

poena as a witness. Yet, when Banks, *with no objection from him or from his lawyer*, was about to take the witness stand, defense counsel was then allowed to take him off the stand for a conference, which included his attorney. Experienced trial lawyers will instantly recognize this, directed toward an unsubpoenaed opposing witness, as a most bizarre, if not wholly unknown, procedure. It is quite evident that defense counsel wished to make one last effort to "prevail" on Banks' lawyer not to let him take the stand. As the majority opinion states, "a vociferous exchange" followed, *but the last ditch effort worked.* Banks' counsel completely reversed the position theretofore steadfastly maintained against all efforts to the contrary. At the brink of the Rubicon, contrary to all expectation, Banks refused to testify.

Advising a man of his constitutional rights is certainly not an impermissible act. Efforts to "prevail" on him not to testify, importunities at the last minute, calling one off the witness stand who is neither one's witness nor his client, are matters of an entirely different character, especially within the setting of this case.

Even if one lawyer is justified in cajoling another lawyer's client to violate agreements previously given, which I greatly doubt, Banks was not "advised" to stay off the witness stand. He was *importuned, persuaded,* and *prevailed upon* to stay off. This is the face of repeated assurances of his availability. Defense counsel knew all this. I do not castigate defense counsel (now deceased) for doing what he could to save his client. I do think that his activities must objectively be judged and that under any minimal code of professional ethics assurances from one member of the Bar to another are worth at least enough to justify counsel in making the crucial decision to put a defendant to trial. To further extend the thought, when the State is deprived of its case while unsuspectingly relying upon such assurances, there ought to be another day. I think the district attorney in this case was met with an event no less

unexpected than if a juror had discussed the case with a witness, or some like event.

Of inescapable importance, this situation was deliberately precipitated solely by the defense. Banks, with no objection from him or his counsel, was in the very act of taking the stand when the defense, contrary to all customary precedent, called him off for the "vociferous exchange". This was the last frantic struggle to head off the testimony of the one and only witness who knew the facts necessary to a conviction of an armed robbery murder. It is not enough to say that the district attorney was simply disappointed.

The inept handling of Banks' immunity status should be none of McNeal's concern. He was neither the beneficiary nor the victim of that phase of the case. The fundamental issue was McNeal's guilt or innocence, not how Banks was being handled. *Banks was not McNeal's witness and McNeal's lawyer was not Banks' lawyer.*

A death knell stratagem which causes a witness and his lawyer to welsh on assurances repeatedly given, assurances upon which the district attorney had every reason to rely up to and even after he called the case to trial, should not be allowed to abort justice.

Under the circumstances of this collateral attack, I do not believe that the Constitution requires a belated plea of prior jeopardy to produce an injustice of the most critical gravity. In the words of *Perez*, cited in the majority opinion, the *nol pros* was mandated by a "manifest necessity", not caused by the prosecution but procured by the defense, and it was necessary to prevent the "defeat of public justice".

With deference, I should think that this Court should firmly plant its judicial fee upon the solid ground, after a jury is sworn to try the issue, that mere prosecution-induced abandonments of the trial will not be tolerated; but, on the other hand, eleventh hour defense stratagems in violation of all prior assurances leading to the suppression of

indispensably necessary evidence will inexorably meet the same fate.

I respectfully dissent.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

COLEMAN, Circuit Judge (dissenting):

For the reasons enumerated in the dissent to the original panel opinion, I respectfully dissent to the denial of rehearing en banc.