**UNITED STATES ex rel. Joseph RUSSO, Appellant,**

v.

**SUPERIOR COURT OF NEW JERSEY, LAW DIVISION, PASSAIC COUNTY, et al., Appellees.**

**No. 72-2154.**

United States Court of Appeals, Third Circuit.

Argued April 30, 1973.

Decided July 24, 1973.

As Amended Aug. 23, 1973.

Certiorari Denied Nov. 12, 1973.
See 94 S.Ct. 447.

Donald Horowitz, Cummins, Cummins, Dunn, Horowitz, Rosener & Pashman; Hackensack, N. J., for appellant.

Joseph D. J. Gourley, Prosecutor, Paterson, N. J., for appellees, Gary H. Schlyen, Passaic, on brief.

Before HUNTER and WEIS, Circuit Judges, and NEWCOMER, District Judge.

### OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This is an appeal from the denial of a writ of habeas corpus by the district court. Appellant Joseph Russo has been accused of committing first degree murder. His first trial ended in a mistrial over his objection.[1] He contends that for the state to retry him would violate the Fifth Amendment's prohibition against double jeopardy.

After his mistrial, appellant moved for a dismissal of the indictments against him. His motion was denied by the trial court. Leave to file an interlocutory appeal was denied by the Appellate Division of the New Jersey Superior Court, and the New Jersey Supreme Court declined to certify the case. Appellant then filed a petition for a writ of habeas corpus. An appeal to this court followed the denial of appellant's petition by the district court.[2]

A full factual exposition is necessary to an understanding of appellant's double jeopardy contention. Appellant has been charged with two murders at a party at his home. His trial on these charges began on December 3, 1971 and ended in a mistrial on December 18, 1971.

The state's principal witness testified that he had seen appellant shoot the victims. But the defense produced a witness who testified that in fact it was the state's witness who had killed the decedents. The state's witness had testified that appellant had fired at one of the victims from close range (two feet) while the defense witness claimed that the state's witness had shot from a distance of seven or eight feet.

There was another mistrial. His double jeopardy claim arises from the first mistrial.

---

1. Between the denial of his motion for certification by the New Jersey Supreme Court and his petitioning for a writ of habeas corpus, appellant was retried.

---

2. The chronology of these events is as follows:

| | | |
|---|---|---|
| 18 December | 1971 | Mistrial declared. |
| 1 May | 1972 | Motion to dismiss indictments denied. |
| 23 May | 1972 | Leave to appeal denied by Appellate Division of the New Jersey Superior Court. |
| 1 June | 1972 | Certification denied by the New Jersey Supreme Court. |
| 5 June | 1972 | Retrial commenced on indictments. |
| 17 June | 1972 | Retrial ends in mistrial. |
| 31 July | 1972 | Appellant files his petition for a writ of habeas corpus. |

The defense then produced a special agent of the Federal Bureau of Investigation. The agent stated that he was not able to find any powder residue on the clothing of the victims and that the presence of powder residue was related to the distance of the gun from the victim. He testified that six to eight feet was the maximum distance at which there could be powder residue on the clothing. That is, it was possible that if the weapon were fired from closer than eight feet, there could be no powder residue. But if it were fired from beyond six to eight feet, there definitely could be none.

"THE COURT: In other words, what you're saying is that if the gun was shot beyond six to eight feet, no matter how far beyond, it wouldn't show powder residue, but if it was shot between the gun barrel and the victim within—if the distance was less than eight feet there could be residue. Is that what you're saying?

"THE WITNESS: Yes, sir, it could. It could be closer, but he is asking me for the maximum distance and I would say eight feet would be the maximum distance at which you wouldn't find with any of those barrel lengths." Appellant's Appendix, 45a–46a.

The witness further testified that if the victims had been shot from close range, powder residue would have been left on the clothing.

"Question: How about residue from two to eighteen inches?

"Answer: Yes, sir.

"Question: Beyond that would there be any?

"Answer: Beyond there, out to probably three to four feet, you might have residue." Appellant's Appendix, 47a.

The testimony of the F.B.I. agent thus tended to support the testimony of the defense's witness. As so often happens, credibility was a key question for the jury.

After hearing testimony for nine days, the jury was charged on the morning of December 17, 1971. The jury began deliberating at 10:35 a.m. At 7:05 p.m., the court recalled the jury to give them a supplemental charge. At 8:20 p.m. the trial court again recalled the jury. The court instructed the jurors to retire and to determine among themselves whether they would be able to reach a verdict shortly. If they could not, they would have to spend the night in a motel. The jury returned to the jury room, and defense counsel objected that the court was "putting undue pressure on the jury at this point to arrive at a verdict."

The jury came back to the courtroom at 8:45 p.m. The following dialogue occurred:

"THE COURT: Madam Forelady, I don't want you to give me any figures. I don't want you to make any statement whatsoever except to respond to my question as to whether you believe that if you stay for a short time here there is a reasonable possibility of you arriving at a unanimous verdict.

"MADAM FORELADY: Yes, your Honor. We need a little bit more time.

"THE COURT: A little bit more time.

Well, the Court will be very happy to make that available for you, but you must understand that you can have all the time that you need whether it is tonight or whether it would be tomorrow. Time is no problem. Those of us who are employed by the County are prepared, as a part of our responsibility, to give the full time to a jury and you folks should understand that you have the full time in order to arrive honestly, without sympathy, without prejudice, without fear, just having in mind what is a just result." Appellant's Appendix, 14a.

The jury returned to the jury room. At 9:50 p.m. they sent a note to the court indicating that at that time they

were far from reaching a verdict. The court then decided to have the jury spend the night in a motel. These events prompted the defense counsel to move for a mistrial on the grounds that the jury was "hopelessly deadlocked." The state indicated it would object to any grant of a mistrial. The court did not specifically rule on the defense motion, but sent the jury to a motel.

The next morning the court sent the jury out to deliberate at 9:28 a.m. Minutes later, the jury sent a note to the judge requesting, among other things, the testimony of both the state's witness and the defense's witness as to the distance of the gun from the victims and the testimony of the F.B.I. agent about the relation of powder residue to distance.

The rest of the morning was devoted to assembling the portions of testimony requested by the jury. It is unclear whether the jury was deliberating from the time of its request until 11:30 a.m. when the portions of the record they had asked for were read to them by the court. The jury retired at 12:15 p.m. for lunch and to continue deliberating. At 2:25 p.m. the court called the jury back to the courtroom, where, as the record shows, the trial judge declared a mistrial without warning to or consultation with either the defense or the prosecution:[3]

"Madam Forelady, I want to ask you a question and I don't want any numbers from you. I would like to get a yes or no answer. Has the jury arrived at a unanimous verdict?

"THE FORELADY: Not yet, your Honor.

"THE COURT: Well, last night there was a question in the Court's mind after reviewing with counsel as to whether or not because of the long time that you spent here, whether it would be fair to let the jury continue to deliberate. I felt I wanted to have

a full opportunity for you to review and to deliberate and, therefore, I arranged for you to have the unpleasantness of going to a motel, which you did, and since then you have had breakfast, you deliberated, you have had lunch, and I noticed as you walked out you seem to be walking out so very wearily and I appreciate very much all that you have done and I am satisfied that it would not be fair to the defendant, nor to the State if in your weariness you arrived at unanimity just for the sake of entering a verdict. I feel that this requires you to be alert and that the time has passed when there is a risk that your verdict would not really represent what you actually feel would be just.

"So that under the circumstances I am going to declare a mistrial and I won't impose upon you any longer than I have. I have imposed upon you because I felt that I had to because of the seriousness of the charge against the defendant that he was entitled to have judged by you and, under the circumstances, I am going to excuse you." Appellant's Appendix, 48a–49a.

Appellant objected to the granting of the mistrial in the judge's chambers after the jury had been dismissed. It is this declaration of a mistrial upon which appellant's double jeopardy contention is based.

Appellant has presented one other ground for relief. He alleges that the walls of the jury room in which the jury deliberated here were thin enough to permit outsiders to overhear conversations that occurred inside the room. As a result of this structural defect, he further alleges, it was common knowledge that the jury in his case was leaning towards acquittal. He claims that he is entitled to an evidentiary hearing as to whether the trial judge had this knowledge and whether he based his decision to declare a mistrial on it. The district court denied his request.

3. At this time the jury had deliberated for approximately fifteen hours.

**12**

## JURISDICTION

Although the state has not questioned our jurisdiction to hear this case, we feel that a brief jurisdictional statement is necessary. Appellant is presently released on $75,000 bail pursuant to Article I, par. 11 of the New Jersey Constitution and Rule 3:26, Revised Rules of Court of New Jersey. He presented his double jeopardy claim to the state courts so he has exhausted his state remedies.

The Supreme Court has recently held that a defendant released on his own recognizance is "in custody" within the meaning of 28 U.S.C. §§ 2241(c)(3), 2254(a). Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973). The only difference between *Hensley* and our case is that Hensley had been convicted of a misdemeanor and was awaiting sentence when he petitioned for habeas corpus while appellant has not yet been convicted.

This is not a significant difference. In Burris v. Ryan, 397 F.2d 553 (7th Cir. 1968), the petitioner was initially charged with rape. That charge was dismissed following a mistrial. The petitioner was then charged with rape, indecent liberties, and contributing to the delinquency of a minor. While on bail and before trial he petitioned for habeas corpus. The court held that he was "in custody" at this time. Other courts have made similar rulings. Matzner v. Davenport, 288 F.Supp. 636, 638 n. 1 (D.N.J.1968), aff'd., 410 F.2d 1376 (3d Cir. 1969); Foster v. Gilbert, 264 F. Supp. 209, 211–212 (S.D.Fla.1967).

If appellant had been tried in federal court, we could hear his double jeopardy claim even though he had not yet been convicted. United States v. Lansdown, 460 F.2d 164, 170–172 (4th Cir. 1972).

■■ In view of *Hensley, Lansdown* and the policy behind the double jeopardy clause, we feel that it is proper for appellant to present his claim. One of the main purposes of the double jeopardy clause is to prevent citizens from being subjected to the ordeal of another trial. United States v. Green, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). See page 11, *infra.* We see no reason sufficient to subvert this purpose by forcing appellant to condition assertion of his right upon conviction. Accordingly, we hold that this court does have jurisdiction under 28 U.S.C. §§ 2241(c)(3), 2254(a).

## DOUBLE JEOPARDY

■ The prohibition against double jeopardy contained in the Fifth Amendment, made applicable to the states by Benton v. Maryland, 395 U.S. 784, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969), has been recognized as a fundamental American right. Behind that clause is a deep concern that the government should not be able to use its vast power and resources to subject a citizen to repeated prosecutions for the same alleged offence. Reprosecution increases the possibility that an innocent man may be found guilty; and it forces a defendant through the ordeal of another criminal trial, involving additional anxiety, insecurity, embarrassment and expense. *E. g.* Green v. United States, 355 U.S. 184, 187–188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). When a mistrial is declared, another policy also is relevant: the defendant may have been deprived of " '[a] valued right to have his trial completed by a particular tribunal,' " [4] which he believes may be "favorably disposed to his fate." [5]

For these reasons the courts have consistently adhered to the standard formulated by Justice Story in United States v. Perez, 9 Wheat. (22 U.S.) 579, 580, 6 L.Ed. 165 (1824) in determining whether a trial judge properly exercised

4. United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), quoting from Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1948).

5. United States v. Jorn, *supra,* 400 U.S. at 486, 91 S.Ct. 547, 558.

his discretion in declaring a mistrial without a defendant's consent:

"We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious cases; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office."

"Manifest necessity" must be present, then, for a trial judge to declare a mistrial and still preserve for the state the right to prosecute a defendant. What constitutes "manifest necessity" is unclear. The Supreme Court has stated that its decisions "escape meaningful categorization;" and the court has emphasized that each case must necessarily turn on its particular facts. Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (U.S.1973).

A trial judge has a broad discretion to determine what factual situations merit a mistrial and allow a defendant to be reprosecuted. Illinois v. Somerville, *supra*. But while the Supreme Court has refused to make hard and fast rules about when mistrials may be declared, it has always recognized that trial judges may declare a mistrial without barring reprosecution only in extraordinary circumstances.[6]

---

6. *E. g.* United States v. Perez, 9 Wheat. (22 U.S.) 579, 580, 6 L.Ed. 165 (1824):

"To be sure, the power ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious cases; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner."

Simmons v. United States, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891), quoting *Perez* "test." Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892), citing *Perez*. Wade v. Hunter, 336 U.S. 684, 692, 69 S.Ct. 834, 839, 93 L.Ed. 974 (1948):

"This case presents extraordinary reasons why the judgment of the Commanding General should be accepted by the courts."

Gori v. United States, 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961):

"Where, for reasons deemed compelling by the trial judge, . . . a mistrial may be declared . . . and he [the defendant] may be retried . . . ."

Downum v. United States, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963):

"The discretion to discharge the jury before it has reached a verdict is to be exercised 'only in very extraordinary and striking circumstances,' to use the words of Mr. Justice Story in United States v. Coolidge, 25 Fed.Cas. 622, 623."

United States v. Jorn, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971):

"The *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings. See United States v. Perez, 9 Wheat. (22 U.S.) 579, 580, 6 L.Ed. 165 (1824)."

Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (U.S.1973):

"The determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one. United States v. Jorn, *supra*."

**14**

Some of the cases, in the words of Justice Douglas, involved "a breakdown in judicial machinery," Gori v. United States, 367 U.S. 364, 372, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961) (dissenting opinion), in which there was no chance of prosecutorial or judicial manipulation that could subject a defendant to a second prosecution when a conviction might not be obtained in the first. United States v. Perez, *supra* (deadlocked jury); United States v. Simmons, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891) (juror acquainted with defendant); Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892) (deadlocked jury); Thompson v. United States, 155 U.S. 271, 15 S.Ct. 73, 39 L. Ed. 146 (1894), (juror disqualified for being member of grand jury which had indicted defendant); Wade v. Hunter, *supra*, (military campaign necessitated termination of court martial). The Court has also looked at what alternatives the trial judge had available to him when he thought that a mistrial was required. Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); United States v. Jorn, *supra*.[7]

The most recent Supreme Court decision in this area is Illinois v. Somerville, *supra*. There the court held that an obvious procedural error in the trial that would make reversal on appeal a certainty justified a retrial after a mistrial had been declared. In *Somerville*, the indictment was defective, and Illinois law would not permit it to be amended. Nor could a defendant waive the defect. Although a prosecutorial mistake was involved, the majority emphasized that the defective procedure did not lend itself to prosecutorial manipulation.[8] The only alternative in that situation was to let the trial continue and to force the state to conduct another complete trial if the defendant were to be convicted in the first one. The court held that in those circumstances the public's interest in "obtaining an impartial verdict or keeping a verdict of conviction if its evidence persuaded the jury" outweighed the defendant's right not to be retried.

█ In reviewing a trial court's declaration of a mistrial, then, we must at least look at the possibility of manipulation inherent in the procedure complained of, the alternatives available to the trial judge at the time, and the presence "of some important countervailing interest of proper judicial administration." Illinois v. Somerville, *supra*, 410 U.S. at 468, 93 S.Ct. at 1074. And it must be emphasized that even in cases where there is no possibility of manipulation or prejudice to a defendant beyond that of undergoing another trial, the double jeopardy clause will bar reprosecution unless there is an *"important countervailing interest* of proper judicial administration." Illinois v. Somerville, *supra*. (Emphasis added).[9]

With these considerations in mind, we move to a review of the trial judge's de-

---

7. In United States v. Gori, *supra*, the court permitted a retrial because the trial judge's ruling was for the "sole benefit" of the defendant. To analyze double jeopardy cases on the basis of which party benefited from the ruling has been questioned by the Supreme Court in United States v. Jorn, supra, 400 U.S. at 483, 91 S.Ct. 547.

8. Justice White's dissent argued that a prosecutorial error could not be a sufficient excuse to reprosecute a defendant. Illinois v. Somerville, *supra*.

9. As Mr. Justice White stated in dissent in *Somerville*:

"*Downum* and *Jorn*, over serious dissent, rejected the view that the Dou-

ble Jeopardy Clause protects only against those mistrials that lend themselves to prosecutorial manipulation and underwrote the independent right of a defendant in a criminal case to have the verdict of the initial jury. Both cases made it quite clear that the discretion of the trial court to declare mistrials is reviewable and that the defendant's right to a verdict by his first jury is not to be overridden except for 'manifest necessity.' " Id., 410 U.S. at 471, 474, 93 S.Ct. at 1075. Where the majority and the dissent differed in *Somerville* is over whether there was manifest necessity to declare a mistrial.

termination that in this case there was manifest necessity present so that appellant can now be retried after having been deprived of a verdict by the jury then empaneled.

The trial judge decided that the jury was too exhausted to reach an impartial verdict. This, argues the state, made a mistrial a manifest necessity. While the appellant argues that no double jeopardy case has ever been decided on the basis of jury exhaustion, we are not willing to state that this could never provide the manifest necessity necessary to declare a mistrial.[10] *Cf.* United States v. Potash, 118 F.2d 54, 56 (2d Cir. 1941), cert. denied 313 U.S. 584, 61 S.Ct. 1103, 85 L. Ed. 1540 (mistrial declaration upheld because a juror was "incapacitated to continue.").

■ We do, however, find that there was no "manifest necessity" in the present case. This is a mixed question of fact and law which we can freely review. *E. g.* Townsend v. Sain, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 9 L.Ed.2d 770; United States ex rel. Thomas v. State of New Jersey, 472 F.2d 735, 737, 738 (3d Cir. 1973).

As Justice Story said in *Perez:*

" . . . [T]he power [to declare a mistrial] ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious cases; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner." Id. 22 U.S. at 580, 6 L.Ed. 165.

No "caution" or "urgent circumstances" appear on this record. Beyond one statement made by the judge while the jury was deliberating [11] and the statement he made to the jury when it was dismissed,[12] there is no support in the record for the trial judge's determination of their physical condition. The trial judge did not ask the jury about its physical condition, and the jury did not volunteer any statements. The jury never indicated that it was exhausted. Nor did the trial judge ask the defense counsel or the prosecutor as to their impression of the jury's condition. In short, there is nothing on the record to distinguish the physical condition of this jury from the condition of any other jury that has heard nine days of testi-

10. The Supreme Court has on numerous occasions made similar statements. *E. g.* Downum v. United States, 372 U.S. 734, 737, 83 S.Ct. 1033, 1035, 10 L.Ed.2d 100. "Here, as in Wade v. Hunter, *supra,* 336 U.S. at 691, 69 S.Ct. at 838, 93 L.Ed. 974, we refuse to say that the absence of witnesses 'can never justify discontinuance of a trial.' Each case must turn on its facts."

11. On the first day of deliberation, the judge had informed the jury that if it could not reach a verdict shortly, he would have to determine whether to send them to a motel for the night. Appellant's attorney objected that the judge was putting undue pressure on the jury, and the judge made the following statement about the propriety of sending the jury to a motel:

"THE COURT: Very well.

"My concern here is that the jury should be able to render a verdict while they are alert and I have some concern that as the hours pass that sometimes people tire. They may not tire, they may have enough enthusiasm for their work that they could go on for hours, but these are responsibilities that I feel that the Court has to weigh. What I am suggesting here is what I feel is necessary in the interest of a just and a fair determination."

12. See page 5. At the hearing on appellant's motion to dismiss the indictments, the judge also made the following statement:

"Now, on the previous occasions that day when the jury emerged from their room the Court had observed what was happening, what had started out to be an alert, neatly dressed and a neatly appearing jury. The men's ties were off and all the parties appeared to be discheveled in appearance. I asked the forelady if the jury had arrived at a unanimous verdict and she exhaustedly said, 'not yet.' I described to the jury my observations of it wearily entering the jurybox and my concern lest their evident condition lead to an unjust verdict." Appellee's Appendix, 20.

mony and deliberated for fifteen hours.[13] Even the prosecutor—quite candidly and properly—admitted before us at oral argument that he was surprised at the trial judge's action.

The Sixth Circuit in United States v. Lansdown, 460 F.2d 164, 169 (4th Cir. 1972) held that:

"The conclusion that a jury is unable to reach a verdict must be supported by something in addition to the trial court's conclusion that the jury has deliberated long enough. (footnote omitted)."

We think a similar rule should be applied as to the jury's physical condition.

Not only was there no inquiry as to the physical condition of the jurors, there was no questioning them as to their progress towards reaching a verdict. Before the defendant loses his Fifth Amendment right, we think that the trial judge must at least determine whether the jury is approaching a verdict. United States v. Lansdown, supra.[14] The only indications present at that time were the jury's response "not yet" to the judge's question as to whether a verdict had been reached and the requests by the jury for certain crucial portions of the testimony. The response "not yet" is perfectly consistent with a jury actively deliberating, People ex rel. Stabile v. Warden City Prison, 202 N.Y. 138, 95 N.E. 729 (Ct.App.1911); and the testimony which the jury requested demonstrated that they were focusing on a crucial issue in the case. To reiterate, the jury never stated anything to indicate that it was exhausted or deadlocked, and the trial judge had previously told the jurors that they could have all the time they needed. See p. 5, supra.

The manner in which the decision in this case was reached could easily lead to manipulation.[15] As the Court said in Green v. United States, 355 U.S. 184, 188, 78 S.Ct. 221, 224 (1957):

"This [jeopardy attaching after the jury is sworn] prevents a prosecutor or judge from subjecting a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict." (Emphasis added).

The jury was dismissed at 2:25 p. m., and the jurors could have been permitted to remain until the end of the day with little additional hardship. The trial was almost at an end, so the state was not saving any resources as a result of the judge's declaration as it did in Somerville.

If "manifest necessity" is to mean anything as a standard, we must find that none existed in this case. A defendant has a valued right to a particular tribunal, and it was taken away from him here.

Much of what the court in United States v. Lansdown, supra, 460 F.2d at 169, stated is applicable:

"We conclude that there was no 'manifest necessity' in this case for declaring a mistrial when the district court did so. The district court, without considering any other factors,

---

13. Fifteen hours is not an unusually long time for a jury to deliberate. In De-Grandis v. Fay, 335 F.2d 173 (2d Cir. 1964), the court held that it was not a violation of due process for a trial judge to have kept the jury in deliberation for twenty-four consecutive hours (i. e., without sleep) during which time the jury twice advised the court of its fatigue.

14. The state contends that the trial judge adhered to the procedures suggested by the New Jersey Supreme Court in inquiring into the possibility that a verdict could be reached. See State v. Hutchins, 43 N.J. 85, 96, 202 A.2d 678, 685 (1964).

While the trial judge did ask the jury whether a verdict might be reached during the first day of deliberations, see pg. 5 supra, the record shows that he made no such inquiry on the following day.

15. We cannot emphasize too strongly that there is nothing to lead us to suspect that the trial judge was guilty of such manipulation. But the possibility exists and is a factor which we definitely must consider. The alternatives are to allow the discretion of the trial judge to go unchecked or to become embroiled in embarrassing inquiries into his motives in each particular case.

simply concluded that approximately 11 hours of deliberation, in a case presenting a close question of credibility, was long enough. The district judge did not seek the opinion of counsel or the defendant; after having told the jury that it could be 'leisurely in its deliberations,' he made no inquiry as to whether the jury was about to reach a verdict or thought that a verdict was possible. Indeed, he rejected statements from the jury that it was on the verge of a verdict and wished to continue. The jury was dismissed at approximately 1:00 P.M. The jurors would have suffered little additional hardship if required to remain at least until the end of the day. Under these circumstances, we believe that the district court failed to protect adequately the defendant's right to have his case decided by a particular tribunal." (footnotes omitted).

■ When he denied appellant's motion for dismissal of the indictments against him, the trial judge indicated that he was "in effect" agreeing with appellant's motion for a mistrial made on the previous day. But as the record shows, appellant's motion was made on the basis that the jury was deadlocked while the trial judge declared a mistrial on the grounds that the jury was exhausted. Appellant could very well have concluded from the jury's request for the critical testimony that there was a strong possibility of a verdict. Appellant's assessment of his chances with this jury could easily have changed after his request for a mistrial. We see no reason to lock him into a motion once it is made.

■ In addition, the trial judge stated at the hearing that appellant's counsel did not object while the jury was in the box and that he only objected as an "afterthought." Appellee's Appendix, pg. 21. While the better practice may be to object as soon as counsel learns that a mistrial is to be granted,

see Scott v. United States, 202 F.2d 354 (D.C.Cir.1952), cert. denied 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952), appellant's counsel was in a difficult situation. He had no advance warning or notice that a mistrial was to be declared; as we mentioned, even the prosecutor admitted that he was surprised by the trial judge's action. The Supreme Court's conclusion in United States v. Jorn, *supra*, 400 U.S. at 487, 91 S.Ct. 547, 558, may also be applicable in this situation:

> ". . . [I]ndeed, the trial judge acted so abruptly in discharging the jury that, had the prosecutor been disposed to suggest a continuance, or the defendant to object to the discharge of the jury, there would have been no opportunity to do so."

Also, to have objected in front of the jury might have prejudiced appellant for trying to "show up" the trial judge, especially if some members of the jury actually did want to go home despite their civic obligation. In this situation, we cannot penalize appellant for failing to object sooner.

■ If we were presented with a close case, we would have the admonishment of the Supreme Court to resolve doubts about the propriety of a mistrial in favor of the liberty of a citizen. Downum v. United States, *supra*, 372 U. S. at 738, 83 S.Ct. 1033. But this is not a close case. We can find no compelling reason to force appellant through still another trial after he was deprived of a jury in the midst of its deliberation. In this instance the state's interest in enforcing its laws must yield to the right of its citizen not to be reprosecuted.

Since we have disposed of this case on appellant's double jeopardy claim, we do not find it necessary to reach his second contention. We repeat what we said in footnote 15, however, that there is nothing to indicate to us that the trial judge behaved with any impropriety.[16]

---

16. Although it should be obvious, we feel that we should add that the construction of the jury room in question here can only lead to similar difficulties occurring

The judgment of the district court will be reversed, and the case remanded to that court for it to grant appellant's petition for a Writ of Habeas Corpus.

in the future. A jury's deliberations are normally considered secret, and the fact that it is possible to hear conversations which take place inside that room opens up possibilities of overt interference with deliberations of the jury as well as claims such as appellant makes here. It may also inhibit jurors in their discussion to realize that certain portions of their conversations may be overheard.

We commend to the attention of the appropriate governmental authorities the new standard work "The American Court-house" published by Edwards Brothers, Ann Arbor, Michigan. At page 56, the text reads: "For security reasons, windows should not permit public exposure, especially at ground level, and the room should be soundproof." The confidentiality of a jury's deliberation and its necessary comfort during this critical time are far too important to be jeopardized by cost cutting construction practices which ultimately develop to be counterproductive.