**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bernard James SEE et al., Defendants-Appellants.**

**Nos. 73-3627, 74-1036 and 74-1056.**

United States Court of Appeals,
Ninth Circuit.

Oct. 4, 1974.

As Modified on Denial of Rehearing
Dec. 9, 1974.

Certiorari Denied March 24, 1975.
See 95 S.Ct. 1428.

Robert Michael Zweig, San Francisco, Cal. (argued in 73–3627), William L. Osterhoudt, San Francisco, Cal. (argued in 74–1036), Oscar B. Goodman (appeared in 74–1056), of Goodman, Snyder & Gang, Las Vegas, Nev., for appellants.

James Brannigan, Atty. (argued), Dept. of Justice, San Diego, Cal., for appellees.

848

Before KOELSCH and WRIGHT, Circuit Judges, and PALMIERI,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

The appellants were convicted of a single count charge of conspiracy to import, distribute and possess marijuana [21 U.S.C. §§ 846 and 963]. On this appeal, they argue that they were twice placed in jeopardy for the same offense, that there was illegal electronic surveillance not explained by the government, and that evidence seized illegally should have been suppressed. Appellant Lillak also asserts that there was insufficient evidence to support the verdict as to him. All appellants ask that we review the sentences imposed.

This smuggling effort involved the use of a small privately owned airplane, flown from Mexico to a desolate area in southern Nevada and there burned intentionally. Lillak had landed the plane at Chula Vista, California early in September 1971 and left orders for it to be serviced so that he might depart the next morning. He left his motel on the following morning and the airplane departed. It crash landed five days later on a dry lake in Nevada, while carrying a full load of marijuana, and was destroyed by fire intentionally set.

The wreckage was discovered by a rancher at 8:30 that morning, and reported to county officials. The sheriff and his deputies proceeded to the scene, identified the aircraft from its numbers and observed marks left by truck tires and fuel drums on the hard surface of the dry lake. At noon, they saw in the distance the dust from two vehicles coming toward the crash site. The officers stopped two pickup trucks three and one-half miles from the wreckage, one driven by appellant See and containing three fuel drums and a gasoline transfer pump. The appellant Gordon was the driver of the other truck, its bed enclosed by a camper shell. Both drivers were armed with hand guns.

An inquiry produced the answer from See that the party was going to a ranch but the officers noted that it was 50 miles in the opposite direction. See replied that they were just seeing where the dirt road might lead them, then asked if the pilot was hurt. The officers had not mentioned an airplane and the wreckage was not visible from the point where the defendants were stopped. See and Gordon were allowed to proceed after a routine check had been made. The trucks were not searched.

Federal agents arrived an hour later. Agent Meglen, having information that linked See, Gordon and the burned airplane with a drug smuggling group, called the sheriff in an adjoining county to stop and search the trucks. In mid-afternoon, deputies apprehended See and Gordon at a gasoline service station in the next county, 180 miles from the dry lake. The vehicles were searched, the two defendants were lodged in the local jail and their wallets and personal effects were put into property envelopes. After an interview by federal agents, See was released without charge; Gordon was charged with an offense not relevant here and released on bond.

The vehicle search revealed a map on which was marked the location of the crashed airplane. See's wallet contained two incriminating notes, one with the room and telephone numbers of Lillak at the motel. Telephone company records showed that calls were placed to Lillak's motel on September 5th and 6th from Gordon's Nevada residence. Lillak returned to the Chula Vista airport on September 15th to deny that he had taken the airplane a week earlier.

See and Gordon were indicted in the district of Nevada, Lillak being named as an unindicted co-conspirator. A mistrial was declared in that action and a later indictment was filed in the southern district of California, this time joining Lillak with See and Gordon. The later case was based on the same facts as the Nevada prosecution. Prior to

* United States District Judge for the Southern District of New York, sitting by designation.

trial defendants See and Gordon moved to dismiss because of double jeopardy and to suppress all items taken from their persons and vehicles at the time of their arrests. Both motions were denied. Additionally, each defendant moved for disclosure of governmental electronic surveillance. Two months before trial, counsel for See by affidavit alleged that his office had been subjected to illegal surveillance, and this was denied by government affidavits directed both to See and to his counsel.

## I. *Double Jeopardy*

Appellants See and Gordon[1] argue that the declaration of a mistrial in the Nevada district court was improper and that the second trial for the same offense in California violated their Fifth Amendment protection against double jeopardy.

The Nevada trial began on April 2, 1973. After three and a half days of trial, the case was given to the jury for deliberation at 12:22 p. m. on April 5. At 3:20 p. m. the following day the jury requested and was given instructions by the judge in open court on a point of law. They returned at 5:13 p. m. with a note to the judge indicating that they were unable to reach a unanimous verdict. They had then deliberated ten hours and three minutes. After the judge received the note disclosing the jury's irreconcilability, the following proceedings occurred in open court:

> THE COURT: Ladies and Gentlemen, I have your note you are unable to reach a unanimous agreement, signed by your foreman. You feel, do you, that it is hopeless to pursue your deliberations any further?

[1]. Appellant Lillak was not a party in the Nevada trial and does not make this argument.

2. The objection by counsel for appellant See was joined in by counsel for Gordon, pursuant to an earlier stipulation between all counsel and the court to the effect that an objection by one defendant would apply to both unless it was specifically stated that the other did not join in the objection.

THE JURY FOREMAN: Yes, we have tried.

THE COURT: You have tried?

SEVERAL JURORS: Yes.

THE COURT: And you don't think that any further deliberation will be apt to produce a unanimous verdict? Is that true? Or do you think it would help?

JUROR NO. 2: Not enough, Your Honor.

THE COURT: Well, you have been at this since noon yesterday. And is this the consensus of the group? That is, do most of you feel this way?

JUROR NO. 4: True.

THE COURT: Very well. If that is the consensus of the group. In view of the length of time you have been out, the Court will declare—

MR. ZWEIG: Counsel,—Your Honor,—just a minute. (Counsel and the Court discussing matter at side bar whispers)

THE COURT: You want to make a record on that, Gentlemen?

MR. GOODMAN: I wanted to think about it.

THE COURT: Go ahead and think about it for awhile.

(Court and Counsel adjourn to chambers, leaving the jury in the box)

During the colloquy in chambers, counsel for Appellants[2] objected to the declaration of a mistrial and requested that the jury be given an "Allen charge."[3] The judge denied these motions and declared a mistrial.

3. COLLOQUY IN CHAMBERS:
MR. ZWEIG: Here is our problem, judge. I don't think they have been deliberating very long—less than ten hours. This is a case in which I asked—asked yesterday to have them sequestered and you denied it. Now in my opinion, this case has been widely published in the newspapers as "another case involving marijuana that is imported." Now this raises the deepest kind of prejudice in

In Illinois v. Somerville, 410 U.S. 458, 463, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973), the Supreme Court reiterated the principles governing the applicability of the Double Jeopardy Clause in the context of a declaration of a mistrial over a defendant's objection: "In United States v. Perez [22 U.S. (9 Wheat. 579, 6 L.Ed. 165 (1824)] and Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892), this Court held that 'manifest necessity' justified the discharge of juries unable to reach verdicts, and, therefore, the Double Jeopardy Clause did not bar retrial."

In *Perez* the Court held that the lower court had properly granted a mistrial when the jury was unable to reach a verdict:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

22 U.S. (9 Wheat.) at 580.

The weight of such decisions has remained on the informed discretion of the trial judge. In *Somerville, supra,* the Court noted that:

> The broad discretion reserved to the trial judge in such circumstances has been consistently reiterated in decisions of this Court.

410 U.S. at 462, 93 S.Ct. at 1069.

In Gori v. United States, 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961), the Court stated that:

> Where, for reasons deemed compelling by the trial judge, *who is best situated intelligently to make such a decision,*

---

the minds of people who have thought about that. I think jurors in cases like this have strong opinions, no matter what the content of the trial. I think with jurors like that, it takes them a time to get beyond that and consider the law. This is the very first time for many of them to try a case like this and they have had problems. Just an hour and a half ago, they came back with a legal question. I think they should continue to deliberate—especially when, at the very first indication, I expected them to say, "We are frustrated—can't agree." But the time spent has not been very long in respect to the problems involved here. I think that a charge like the Allen charge should be given, where Your Honor should let them know that some jury is going to have to decide this; that every case is tough, but they are going to have to make a decision if they can, and send them out again. And if, later, they are still deadlocked—if they haven't changed their vote—then perhaps consider a mistrial. But I think, after an hour and a half, with just the slightest showing that they are frustrated,

(and that is all we have, is just the "slightest showing" that they are frustrated) that it is greatly prejudicial to the defendants to declare a mistrial. I don't think they are having their case fully deliberated by the jury,—and I really feel it is a double-jeopardy attack. They are entitled to have it heard by the jury.

THE COURT: You had it heard. I think you had it heard long enough.

MR. ZWEIG: I take exception to calling a mistrial at this time, and ask specifically that the Allen instruction be given.

THE COURT: I think at this time I am going to discharge them. To push them either way, would be wrong.

(Court and Counsel return into Court)

FURTHER PROCEEDINGS IN OPEN COURT:

THE COURT: Very well, Ladies and Gentlemen, in view of your inability to reach a verdict in this case, I now declare a mistrial. This case, of course, will need to be tried at some other time before some other jury.

the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared. . . .

(Emphasis added.)

■ The trial judge must balance the defendant's "valued right to have his trial completed by a particular tribunal," [4] with society's interest in just judgments and the conservation of judicial resources. In its most recent decision on the Double Jeopardy Clause, the Supreme Court emphasized that a *"defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."* Somerville, supra at 470, 93 S.Ct. at 1073, quoting *Wade, supra* at 688–689, 69 S.Ct. 834.

However, the declaration of a mistrial because of the inability of a jury to reach a unanimous verdict also serves to protect the interests of the defendant in many cases. As the Second Circuit noted in United States v. Goldstein, 479 F.2d 1061, 1068 (2d Cir. 1973):

Requiring a jury to continue deliberations despite genuine and irreconcilable disagreement more often than not defeats the ends of public justice; not only will such compulsion needlessly waste valuable judicial resources, it may coerce erroneous verdicts.

In that case the court held that the trial judge had not abused his discretion in declaring a mistrial after the jury had twice reported that it was unable to reach a verdict.

As stated in *Wade, supra,* 336 U.S. at 691, 69 S.Ct. at 838:

[T]he guiding principles of the *Perez* decision . . . command courts in considering whether a trial should be terminated without judgment to take "all circumstances into account" and thereby forbid the mechanical application of an abstract formula.

■ However, in determining whether a judge has abused his discretion in declaring a mistrial because of a hung jury, the courts have isolated some significant factors. The trial judge must determine whether there is a probability that the jury can reach the verdict within a reasonable time.[5]

■ The "crucial factor" in determining the probability of agreement is a statement from the jury that it is "hopelessly deadlocked." United States v. Lansdown, 460 F.2d 164, 170 (4th Cir. 1972).[6]

■ A statement by the jury that it is currently deadlocked has been held an insufficient ground for declaring a mistrial. The judge should question the jury in such circumstances, either individually or through its foreman, on the possibility that its current deadlock could be overcome by further deliberations.[7]

■ Although a poll of jurors is the preferred method in some states, [8] questioning the jury as a group on the possibility of a verdict is an acceptable alternative.[9] Note that it has been held reversible error to inquire whether there

---

4. Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

5. United States v. Lansdown, 460 F.2d 164, 169 (4th Cir. 1972), *see also* American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury § 5.4(c) (Approved Draft, 1968). ("no reasonable probability of agreement" at 146.)

6. *And see* United States ex rel. Russo v. Superior Court of New Jersey, 483 F.2d 7, 16 (3d Cir. 1973), cert. denied 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973).

7. United States v. Goldstein, 479 F.2d 1061, 1068–1069. Trial by Jury, *supra* at 157.

8. *E. g.*, Paulson v. Superior Court of El Dorado County, 58 Cal.2d 1, 22 Cal.Rptr. 649, 652, 372 P.2d 641 (1962).

9. Clemensen v. Municipal Court, 18 Cal.App. 3d 492, 96 Cal.Rptr. 126, 131–132 (Ct. of App., 1971); People v. Caradine, 235 Cal. App.2d 45, 44 Cal.Rptr. 875, 878 (Ct. of App., 1965).

was a predominance one way or the other.[10]

■ The judge may consider whether the exhaustion of the jury might induce the minority to vote for a verdict which they would otherwise not support, *cf.* United States ex rel. Russo v. Superior Court of New Jersey, 483 F.2d 7, 15 (3d Cir. 1973).

The length of the trial and the complexity of the issues facing the jury are also elements to be examined by the trial judge.[11]

The time taken in deliberations by the jury is also a significant factor to be evaluated by the trial judge, although no fixed standards have been set.[12]

The American Bar Association study, Trial by Jury, concluded that "the minimum deliberation time should depend at least in part upon the length of the trial," at 157. It noted that in trials lasting 3–5 days, juries which were hung took an average of approximately 3 times as much time (10.8 hours) as juries which reached a verdict (3.7 hours), citing Kalven & Zeisel, The American Jury 459 (1966).

■ Based on these considerations, it is clear that the trial judge below did not abuse his discretion in declaring a mistrial after the jury indicated it was hopelessly deadlocked after over ten hours of deliberations over two days. The trial took three and a half days, and the time spent in deliberation by the jury was not so disproportionately brief as to indicate that further discussion was necessary. The time taken by the jury falls within the average time spent by juries in cases of similar length.

While this is not a determinative factor by itself, it is significant when taken in conjunction with the other issues discussed below.

This jury indicated to the judge in writing that it was deadlocked. He did not rely on this statement alone, but rather called them into open court and questioned the foreman and members as to whether there was any possibility that a verdict could be reached and whether additional time for deliberation would be of assistance. The replies were all negative. The experienced trial judge, having observed the jury during the three and a half days of trial and having seen and heard their responses to his questions in open court, concluded that any additional actions on his part to "push" the jury towards a decision would be inappropriate. Accordingly, he dismissed the jury and declared a mistrial, denying requests of counsel for continued deliberations and an Allen charge.

No request was made by counsel for the appellants for the court to poll the jurors individually with respect to the prospect of reaching a verdict. The judge's questions in open court certainly provided both an opportunity for jurors to give contrary opinions and for the judge to gauge their individual reactions to his questions. In such circumstances it would be inappropriate to rule that the trial judge had abused his discretion by failing to poll the jurors individually.

The case was not a complicated one and only a single count of conspiracy was involved. The judge could certainly have ruled that further deliberations would be inappropriate, given the length of time already spent, the complexity of

---

10. Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926). *See also* Marienfield v. United States, 214 F.2d 632 (8th Cir.), cert. denied 348 U.S. 865, 75 S.Ct. 87, 99 L.Ed. 681 (1954) (despite simple request for numerical breakdown of jury, foreman reveals actual predominance).

11. *Goldstein, supra* 479 F.2d at 1068; Trial by Jury, *supra* at 157.

12. *Lansdown, supra* 460 F.2d at 169; *Goldstein,* 479 F.2d at 1069 (time needed to reach a verdict was a determination "best left to a trial judge" and "difficult to gauge by another district judge or by appellate judges on a cold record.") *Compare* Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892) (jury deliberated 40 hours) with United States v. Brahm, 459 F.2d 546 (3d Cir. 1972) (jury deliberated 5 hours) *and* United States v. Jim Lee, 123 F. 741 (N.D. Cal.1903) (jury deliberated one hour and thirty-five minutes).

the case, and the clear assertions of the jury that they were hopelessly deadlocked.

The decision of the judge below is supported by decisions in this and other circuits. In Tolan v. United States, 370 F.2d 799 (9th Cir.), cert. denied 387 U.S. 932, 87 S.Ct. 2052, 18 L.Ed.2d 994 (1967), the trial court declared a mistrial after the jury declared itself hung after twelve hours of deliberation. We held that "There is no basis for us to hold on these circumstances that the court clearly abused its discretion." *Id.* at 803. *See also* Forsberg v. United States, 351 F.2d 242 (9th Cir. 1965), cert. denied, 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966).

In United States v. Cording, 290 F.2d 392, 393 (2d Cir. 1961), the foreman of the jury reported after three hours and fifty minutes of deliberation that:

> [T]he jury had not been able to agree and that there was no likelihood of their agreement if they were kept out longer. Judge Abruzzo thereupon declared a mistrial. Since the jury had declared its inability to agree on a verdict, the action of the court in discharging the jury was a proper exercise of its discretion.

*See also* United States v. FitzGerald, 205 F.Supp. 515 (N.D.Ill., 1962).

In United States v. Brahm, 459 F.2d 546, 550 (3d Cir. 1972), it was said:

> The jury had deliberated for over five hours . . . in a case which took only two days . . . . It was not unreasonable or unusual for the court to dismiss the jury . . . under these circumstances.

In that case the jury had indicated several times that it was deadlocked. The court, however, cited other issues in support of its decision to affirm the declaration of a mistrial, 459 F.2d at 550.

The appellants cite both the *Lansdown, supra,* and *Russo, supra,* cases in support of their contention that the trial judge abused his discretion in declaring a mistrial. These cases are clearly inapposite.

In *Lansdown* the judge, *sua sponte* declared a mistrial, ignoring the statement of the jury foreman that they were "on the verge" of a verdict. The Court of Appeals concluded:

> There are many cases, which we believe have been correctly decided, where the trial court was sustained after dismissing juries where they had deliberated less than the approximately 11 hours in this case . . . . . However, in each of these cases the jury had specifically stated that they were hopelessly deadlocked, a crucial factor missing in the present case.

460 F.2d at 169.

In the case before us, the jury stated on several occasions (and were questioned on their statement by the judge) that they were hopelessly deadlocked. *Lansdown* is thus distinguishable.

■ In *Russo,* the court held that the trial judge abused his discretion in declaring a mistrial after nine days of trial and 15 hours of deliberation by the jury when the forelady indicated that the jury had "not yet" reached a verdict. The court held that "we think that the trial judge must at least determine whether the jury is approaching a verdict." 483 F.2d at 16. It noted that "the jury never stated anything to indicate that it was exhausted or deadlocked, and the trial judge had previously told the jurors that they could have all the time they needed." *Id.* Again, the case is distinguishable,[13] since the jury

---

13. The case might also be distinguished on the ground that it involved a trial for a capital offense. As noted in *Perez,* "in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner." 22 U.S. (9 Wheat.) at 580. This heightened concern of the court was certainly noted by the Court of Appeals in Russo since this passage from

*Perez* was quoted three times in the opinion in the space of three pages, 483 F.2d at 13, at 13 n. 6, and at 15.

In striking a balance between the interests of the state and those of the defendant, the courts have been admonished therefore to give more weight to the fate of the person charged with a capital offense. *See* McNeal v. Collier, 353 F.Supp. 485 (N.D.Miss., 1972)

had not indicated that it was hopelessly deadlocked, as here. Appellants have not cited, nor does our research disclose, any federal decision which has held that a mistrial was prematurely declared once the jury stated to the district judge that there was no probability that it would reach a verdict.

 Considering all of the circumstances, we conclude that there was "manifest necessity" in this case for declaring a mistrial, and that the trial judge did not abuse his discretion when he did so. When a trial judge has been informed by the jury that it is hopelessly deadlocked, and when he is convinced after appropriate questioning that further deliberations might lead to a coerced verdict, he does not abuse his discretion by dismissing the jury after ten hours of deliberations following a trial of three and a half days.

 Appellants See and Gordon also contend that an Allen instruction [14] should have been given before the mistrial was declared. During their colloquy with the judge in chambers after the jury had announced it was deadlocked, counsel for Appellant See had moved for the use of "a charge like the Allen charge." This was denied by the trial judge: "To push them either way, would be wrong."

As we stated in Sullivan v. United States, 414 F.2d 714, 716 (9th Cir. 1969):

We doubt that it is really any longer advisable to give the Allen instruction at all, and it *certainly should be given only when it is apparent to the district judge from the jury's conduct or the length of its deliberations that it is clearly warranted.*

(Emphasis added.) *Cf.* United States v. Contreras, 463 F.2d 773 (9th Cir. 1972). The Seventh Circuit has upheld the refusal of a trial judge to give a *modified* Allen instruction when he thought its use would be coercive, United States v. Medansky, 486 F.2d 807, 813 (7th Cir. 1973), cert. denied 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 886 (1974) (jury twice stated it is deadlocked, mistrial declared after 14 hours of deliberations).

It would be contrary to solidly reasoned law to require a district judge to give an Allen instruction when the experienced trial judge, acting in his sound discretion and best judgment, determines that such an instruction would be coercive.

## II. *Probable Cause for Arrest*

 Appellants See and Gordon [15] claim that Meglen [16] lacked probable cause for their custodial arrest and the

---

rev'd on other grounds, sub nom. McNeal v. Hollowell, 481 F.2d 1145 (5th Cir., 1973) : "In a capital case, special consideration must be given to the rights of the accused." 353 F.Supp. at 490.

This is not to say that those accused on misdemeanors or non-capital offenses are to be denied their double jeopardy protections, Ex parte Lange, 85 U.S. (18 Wall.) 163, 173, 21 L.Ed. 872 (1873) ; but rather that courts should exercise extreme caution in weighing the rights of those accused of capital crimes.

14. Originally approved in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

15. Defendant Lillak also seeks reversal due to the admission of this evidence. Under the test recently announced by the Supreme Court, Lillak lacks standing to contest the search and seizure. Lillak "(a) [was] not

on the premises at the time of the contested search and seizure; (b) [had] no proprietary or possessory interest in the premises; and (c) [was] not charged with an offense which includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." Brown v. United States, 411 U.S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973).

16. Whether probable cause existed must be determined from the information available to Meglen at the time he put out the bulletin, since the sheriff's deputies, as they were entitled to do, were acting in reliance on Meglen's authority to arrest. *See* Whiteley v. Warden, 401 U.S. 560, 568–569, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) ; *see also,* United States v. Williams, 459 F.2d 44 (9th Cir. 1972).

fruits of the search incident to the illegal arrest were inadmissible.

 At the outset it is clear that See and Gordon were arrested before the search. Upon apprehension at the service station they were instructed that they were not "free to leave" and that they had to surrender their firearms. After doing so, they were directed to move their vehicles 200 yards to the sheriff's office which they did with deputies following in patrol cars. At the sheriff's office the trucks were searched and appellants were booked.

When they were instructed at the service station that they were not "free to leave" and that they were to surrender their hand guns, their "liberty of movement" was restricted, and the arrest was complete. See, e. g., Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed. 2d 134 (1959); United States v. Strickler, 490 F.2d 378 (9th Cir. 1974); and Taylor v. Arizona, 471 F.2d 848 (9th Cir. 1974).

 An arrest without a warrant and a reasonable search incident to that arrest are valid if the arrest is based on probable cause. Probable cause for a custodial arrest is determined by examining whether "the facts and circumstances within [Meglen's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); United States v. Strickler, supra. From the record and applying this standard, we conclude that there was justification for the arrests.

 An airplane loaded with marijuana had crashed and been burned at a remote spot in Nevada. Meglen's prior investigations connected See, Gordon and the crashed airplane with a marijuana smuggling group. They had apparent knowledge of the airplane crash on the dry lake at a time when they could not have known of it. Smuggling involving an airplane commonly requires a ground crew to carry the goods away and to refuel the airplane. See and Gordon were equipped as such a crew would be, with a truck to carry fuel, a pump to transfer it, and a camper to conceal the marijuana on the trip out. Meglen's prior experience with this method of smuggling augmented his probable cause. See, e. g., United States v. Patterson, 492 F.2d 995 (9th Cir. 1974); United States v. Ardle, 435 F.2d 861 (9th Cir. 1970); Hernandez v. United States, 353 F.2d 624 (9th Cir. 1965). The excuse given by appellants to the first group of officers that they were going to a ranch, which was 50 miles in the opposite direction, gave Meglen reason to believe that their armed presence at that remote place at that time was more likely due to smuggling than to some innocent purpose.

The aggregate of the facts and circumstances within Meglen's knowledge would warrant a prudent man's belief that See and Gordon were involved in the marijuana smuggling and, therefore, Meglen had probable cause to order their arrest for participation in that crime. As an incident to that arrest, the search of appellants' persons, United States v. Robinson, 414 U.S. 218, 94 S.Ct. 218, 38 L.Ed.2d 427 (1973), and the reasonable search of their vehicles for implements used to commit the crime was proper. See, e. g., Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); United States v. Selby, 407 F.2d 241 (9th Cir. 1969); and Oelke v. United States, 389 F.2d 668 (9th Cir. 1967). The motions to suppress were properly denied.

### III. *Electronic Surveillance*

When an accused claims that he has been subjected to electronic surveillance by the government, Title 18 U.S.C. § 3504 [17] requires that the government af-

---

17. Title 18 U.S.C. § 3504 provides in pertinent part:

"In any trial, hearing, or other proceeding in or before any court, grand jury, depart-

firm or deny the act. Appellants contend that the government's responses to their several demands for disclosures of electronic surveillance of themselves and of defendant See's attorney were inadequate.

■ In United States v. Alter, 482 F.2d 1016 (9th Cir. 1973), we required that the government's reply to a party's claim under § 3504 be "factual, unambiguous and unequivocal." However, because responding to ill-founded claims of electronic surveillance would place an awesome burden on the government, a claim of government electronic surveillance of a party must be sufficiently concrete and specific before the government's affirmance or denial must meet the requirements of *Alter, supra.* Accordingly, a general claim requires only a response appropriate to such a claim.[18] *See* United States v. Vielguth, 502 F.2d 1257 (9th Cir. July 17, 1974).

■ The record discloses that the appellants' claim of electronic surveillance of them was vague to the point of being a fishing expedition. The government's response to the claim was more than adequate.

■ The affidavit to support the claim that defendant See's attorney had been subjected to electronic surveillance averred that counsel's telephones had been tapped during the previous five years but the affidavit did not allege that any electronic surveillance had been conducted in connection with the attorney's representation of this defendant.

Because this claim that counsel's telephones had been tapped does not meet the requirements we set forth in *Alter, supra,* the claim does not command *any* response; thus, we need not decide whether the government's response was adequate. *See* United States v. Alter,

*supra;* United States v. Vielguth, *supra.*

### IV. *Motion for Acquittal*

Appellant Lillak alleges error in the denial of his motion for acquittal at the close of the government's case.

■ We have summarized the facts of the airplane landing, the marks of truck tires and fuel drums and evidence that appellants See and Gordon were driving near the scene equipped to transport the contraband and refuel the airplane. That evidence establishes the existence of a conspiracy to illegally import marijuana.

■■ Once the existence of a conspiracy is established, slight evidence is sufficient to connect a given defendant with it. *See, e. g.,* United States v. Jit Sun Loo, 478 F.2d 401 (9th Cir. 1973); United States v. Yaple, 450 F.2d 308 (9th Cir. 1971). Evidence of Lillak's participation included: the proximity of defendants See and Gordon to Lillak's airplane loaded with marijuana on the remote dry lake bed; Gordon's telephone calls to Lillak's motel in San Ysidro, California from Las Vegas, Nevada on September 5th and 6th; Lillak's preparation of the plane on September 7th; and the plane's departure on the 8th, the same day that Lillak checked out of his motel room in San Ysidro.

Assessing this evidence, as we must, "in the light most favorable to the prosecution," *e. g.,* United States v. Eskridge, 456 F.2d 1202 (9th Cir. 1972), we conclude that the evidence was substantial enough for the jury to properly infer, beyond a reasonable doubt, that Lillak was guilty of conspiring to illegally import and distribute marijuana. *See, e. g.,* American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Jit Sun Loo,

---

ment, officer, agency, regulatory body, or other authority of the United States—(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim

shall affirm or deny the occurrence of that alleged unlawful act . . . ."

18. Because varying degrees of specificity in a claim will require varying degrees of specificity in a response, we do not attempt to delineate the contents of the response. United States v. Alter, *supra,* at 1027 n. 19.

*supra;* United States v. Nelson, 419 F.2d 1237 (9th Cir. 1969). Lillak's motion for judgment of acquittal was properly denied by the district court.

V. *Review of Appellants' Sentences*

 All appellants ask this court to review their sentences. Each was sentenced to four years in prison, one year less than the maximum allowable. "A sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review." United States v. Tucker, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *see, e. g.,* United States v. Flohr, 472 F.2d 1165 (9th Cir. 1973); United States v. Sanders, 466 F.2d 673 (9th Cir. 1972); Gebhard v. United States, 422 F.2d 281 (9th Cir. 1970). Appellants come within no exception to this rule.

The judgment is affirmed as to each defendant.